**\*\* FOR PUBLICATION IN WEST'S HAWAI'I REPORTS AND THE PACIFIC REPORTER  \*\***

**Electronically Filed
Supreme Court
SCWC-17-0000432
04-NOV-2022
08:06 AM
Dkt. 22 OP**

IN THE SUPREME COURT OF THE STATE OF HAWAI'I

---o0o---

_____

FREDERICK NITTA, M.D.,
Respondent/Appellant-Appellant,

vs.

DEPARTMENT OF HUMAN SERVICES, STATE OF HAWAI'I,
Petitioner/Appellee-Appellee,

and

CATHY BETTS, DIRECTOR,
Respondent/Appellee-Appellee.

_____

SCWC-17-0000432

CERTIORARI TO THE INTERMEDIATE COURT OF APPEALS
(CAAP-17-0000432; CIVIL NO. 3CC16-1-0000297)

NOVEMBER 4, 2022

RECKTENWALD, C.J., McKENNA, WILSON, AND EDDINS JJ., AND
CIRCUIT JUDGE KAWAMURA, IN PLACE OF NAKAYAMA, J., RECUSED

OPINION OF THE COURT BY McKENNA, J.

## I. Introduction

This case arises out of the State of Hawaiʻi Department of Human Services' ("DHS") attempt to recover payments made to Frederick Nitta, M.D. ("Dr. Nitta") from its Medicaid Primary Care Physician Program ("the Program"). The Program was established by a federal statute within the Affordable Care Act ("ACA"), specifically 42 U.S.C. § 1396a(a)(13)(C)("the Statute"). The Statute enabled physicians "with a primary specialty designation of family medicine, general internal medicine, or pediatric medicine" to temporarily receive increased payments for primary care services provided to Medicaid patients in 2013 and 2014. DHS, through its Med-QUEST division, administers the Program in the State of Hawaiʻi.

Dr. Nitta, who has been board-certified in obstetrics and gynecology ("OB/GYN") since the early 1990's, but who has been serving as a primary care physician ("PCP") to Medicare and Medicaid patients in East Hawaiʻi for many years, became a participant in the Program when a staff member signed him up on-line at the suggestion of an AlohaCare representative. In 2015, however, DHS told Dr. Nitta he was ineligible because he did not meet specialty requirements for Program participants as set forth in a federal administrative rule, 42 C.F.R. § 447.400

("the Rule"). DHS then demanded repayment of more than $200,000 in enhanced payments received by Dr. Nitta through the Program.

Dr. Nitta requested an administrative hearing and an administrative appeal at DHS. He later filed for a judicial appeal by the Circuit Court of the Third Circuit ("circuit court"). All deemed Dr. Nitta ineligible. Dr. Nitta then brought a secondary appeal to the Intermediate Court of Appeals ("ICA").

While the ICA appeal was pending, the Court of Appeals for the Sixth Circuit issued an opinion invalidating the Rule. Averett v. United States Dep't of Health & Hum. Servs., 943 F.3d 313, 319 (6th Cir. 2019). In a published opinion, the ICA adopted the Sixth Circuit's analysis in Averett. Nitta v. Dep't of Hum. Servs., 151 Hawaiʻi 123, 128, 508 P.3d 1209, 1214 (App. 2022). Because DHS and the circuit court had relied on the invalidated Rule to order repayment by Dr. Nitta, the ICA ordered a remand to DHS for further proceedings as may be necessary. Nitta, 151 Hawaiʻi at 129, 508 P.3d at 1215.

On certiorari, DHS does not contest the Sixth Circuit and ICA's invalidation of the Rule. Instead, DHS argues the ICA erred because (1) Dr. Nitta was still ineligible for the Program under the Statute; (2) the circuit court had also relied on the Statute in deeming Dr. Nitta ineligible; and (3) DHS is required

3

to recoup the overpayment because there was never money appropriated to pay Dr. Nitta.

With respect to the first issue, the ICA did not address whether Dr. Nitta would in any event be precluded from enhanced payments based on the Statute. In Averett, the Sixth Circuit held the Statute's phrase, "physician with a primary specialty designation," to mean "a physician who has himself designated, as his primary specialty, one of the specialties recited in [the Statute]." Averett, 943 F.3d at 319. The ICA adopted this holding, Nitta, 151 Hawaiʻi at 128, 508 P.3d at 1214, but did not address whether Dr. Nitta qualified.

We agree with DHS that Dr. Nitta's eligibility for the Program under the Statute can and should be addressed. We also agree with the Sixth Circuit and the ICA that the Rule is invalid as it contravenes the Statute. Contrary to DHS's position, however, we hold Dr. Nitta was entitled to enhanced payments under the Statute based on the reasoning below.

This holding resolves DHS's second issue on certiorari, that the circuit court had also relied on the Statute to hold Dr. Nitta ineligible. If the circuit court had so held, it would have been wrong. But, in any event, the circuit court (and DHS) relied solely on the invalidated Rule in deeming Dr. Nitta ineligible and did not rely on the Statute.

4

Finally, we also reject DHS's third issue on certiorari, that DHS is required to recoup the overpayment because there was never money appropriated to pay Dr. Nitta. This is a new argument never raised below and is therefore waived.

Hence, we vacate the ICA's March 23, 2022 judgment on appeal to the extent it remanded the case "to the DHS Administrative Appeals Office for further proceedings as may be necessary." We otherwise affirm the ICA's judgment on appeal.

## II. Background

### A. Factual Background

#### 1. The Program

As explained by the ICA, Medicaid provides medical assistance to qualifying individuals and families, and is jointly funded and administered by the federal and state governments. Nitta, 151 Hawaiʻi at 124, 508 P.3d at 1210. In 2010, Congress enacted the ACA and also temporarily increased payments in 2013 and 2014 to certain physicians who provided primary-care services to Medicaid patients. Id. Specifically, the Statute, 42 U.S.C. § 1396a(a)(13)(C), allowed for such increased payments provided "by a physician with a primary specialty designation of family medicine, general internal medicine, or pediatric medicine." The Statute provides:

> (a)   A State plan for medical assistance must—
>
>        . . . .

5

(13) provide—

. . . .

(C) payment for primary care services (as defined in subsection (jj)) furnished in 2013 and 2014 by a physician with a primary specialty designation of family medicine, general internal medicine, or pediatric medicine at a rate not less than 100 percent of the payment rate that applies to such services and physician under part B of subchapter XVIII (or, if greater, the payment rate that would be applicable under such part if the conversion factor under section 1395w-4(d) of this title for the year involved were the conversion factor under such section for 2009)[.][1]

As further explained by the ICA, the Centers for Medicare and Medicaid Services ("CMS") administers Medicaid, and promulgated the Rule, 42 C.F.R. § 447.400, further delineating physician eligibility for the Program. Nitta, 151 Hawaiʻi at 125, 508 P.3d at 1211. The Rule set out a board certification

---

[1]     42 U.S.C. § 1396a(jj) then provides:

(jj) Primary care services defined

For purposes of subsection (a)(13)(C), the term "primary care services" means—

(1) evaluation and management services that are procedure codes (for services covered under subchapter XVIII) for services in the category designated Evaluation and Management in the Healthcare Common Procedure Coding System (established by the Secretary under section 1395w-4(c)(5) of this title as of December 31, 2009, and as subsequently modified); and
(2) services related to immunization administration for vaccines and toxoids for which CPT codes 90465, 90466, 90467, 90468, 90471, 90472, 90473, or 90474 (as subsequently modified) apply under such System.

or a sixty-percent billing threshold requirement, requiring that:

> (a) [s]tates pay for services furnished by a physician as defined in § 440.50 of this chapter, or under the personal supervision of a physician who self-attests to a specialty designation of family medicine, general internal medicine or pediatric medicine or a subspecialty recognized by the American Board of Medical Specialties (ABMS), the American Board of Physician Specialties (ABPS) or the American Osteopathic Association (AOA). Such physician then attests that [they]:
>
>> (1) [Are] Board Certified with such a specialty or subspecialty and/or
>>
>> (2) Has furnished evaluation and management services and vaccine administration services under codes described in paragraph (b) of this section that equal at least 60 percent of the Medicaid codes he or she has billed during the most recently completed CY or, for newly eligible physicians, the prior month.

42 C.F.R. § 447.400(a).  Nitta, 151 Hawaiʻi at 125, 508 P. 3d at 1211.

Thus, the Statute allowed for enhanced payments to "a physician with a primary specialty designation of family medicine, general internal medicine, or pediatric medicine." The Rule, however, further required physicians to self-attest to a specialty designation of family medicine, general internal medicine or pediatric medicine and then also attest that they are board-certified in one of those designations (or a recognized subspecialty[2]) or show that at least sixty percent of their billings were for the provision of PCP services.

---

[2]     According to the American Board of Medical Specialties, the subspecialties of family medicine are adolescent medicine, geriatric

(continued. . .)

7

In Hawaiʻi, pursuant to the Rule, DHS required physicians seeking enhanced payments to complete a form on its website self-attesting to those requirements ("self-attestation form"). The form tracked Rule requirements and also said it could not be completed by anyone on the provider's behalf.  Nitta, 151 Hawaiʻi at 125, 508 P.3d at 1211.

### 2.   Dr. Nitta's involvement with the Program

Dr. Nitta was board-certified as an OB/GYN in the early 1990's and has practiced medicine in Hilo, Hawaiʻi for many years.  When Dr. Nitta began practicing in 1993, he submitted an application to DHS to participate as a Medicaid provider, listing OB/GYN as his specialty.  In 2006, Dr. Nitta received

---

(continued. . .)
medicine, hospice and palliative medicine, pain medicine, sleep medicine, sports medicine; the subspecialties of internal medicine are adolescent medicine, adult congenital heart disease, advanced heart failure and transplant cardiology, cardiovascular disease, clinical cardiac electrophysiology, critical care medicine, endocrinology, diabetes, and metabolism, gastroenterology, geriatric medicine, hematology, hospice and palliative medicine, infectious disease, interventional cardiology, medical oncology, nephrology, neurocritical care, pulmonary disease, rheumatology, sleep medicine, sports medicine, and transplant hepatology; and the subspecialties of pediatric medicine are adolescent medicine, child abuse pediatrics, development-behavioral pediatrics, hospice and palliative medicine, medical toxicology, neonatal-perinatal medicine, pediatric cardiology, pediatric critical care medicine, pediatric emergency medicine, pediatric endocrinology, pediatric gastroenterology, pediatric hematology-oncology, pediatric hospital medicine, pediatric infectious diseases, pediatric nephrology, pediatric pulmonology, pediatric rheumatology, pediatric transplant hepatology, sleep medicine, and sports medicine.  See Specialty and Subspecialty Certificates, AMERICAN BOARD OF MEDICAL SPECIALTIES, https://www.abms.org/member-boards/specialty-subspecialty-certificates/ [perma.cc/D666-JDHK] (last visited November 1, 2022).

his National Provider Identifier, which also indicated a specialty of OB/GYN.[3]

More than ninety percent of Dr. Nitta's patients, however, are eligible for Medicaid or Medicare and do not have other doctors. Thus, although he is a board-certified OB/GYN physician, Dr. Nitta provides PCP services for his patients, is recognized in the community as a PCP, and provides a broad range of services to his patients.

Hence, in 2013, at the suggestion of an AlohaCare representative, a staff member from Dr. Nitta's office enrolled him in the Program via the DHS website. The parties do not dispute that Dr. Nitta was attested to have a specialty designation of family medicine, general internal medicine, or pediatric medicine.

It appears Dr. Nitta first learned he was participating in the Program when he received a letter from DHS dated July 7, 2015 telling him he was ineligible because he did not satisfy Rule requirements. Then, in a letter dated November 6, 2015, DHS demanded repayment of $205,940.13 in payments made to him via the Program.

---

[3] The National Provider Identifier program is discussed in Section IV.A.2 below.

## B.  Procedural background

### 1.  At DHS

#### a.  DHS administrative hearing decision

On December 4, 2015, Dr. Nitta submitted an administrative hearing request with DHS contesting the repayment demand.  On March 18, 2016, the parties participated in a hearing before a DHS hearing officer.[4]  On June 16, 2016, the hearing officer issued his decision in DHS's favor and against Dr. Nitta.  In summary, the hearing officer ruled DHS was entitled to repayment because Dr. Nitta was board certified in OB/GYN, not in family medicine, general internal medicine, or pediatric medicine, and because Dr. Nitta had not met the sixty percent billing requirement under the Rule.

#### b.  DHS final decision

Dr. Nitta then sought an administrative appeal with DHS. On July 25, 2016, then-DHS Deputy Director Pankaj Bhanot issued DHS's final decision, basically adopting the hearing officer's decision.

This final decision, however, also included findings that HMSA, UnitedHealthcare, AlohaCare, and Hilo Medical Center all

---

[4]  The testifiers were Kurt Kresta, the DHS Financial Integrity Staff investigator in charge of Dr. Nitta's case; Dr. Nitta; Dr. Lori Kanemoto, an OB/GYN familiar with Dr. Nitta and his practice; and Della Marie Shirota, a coding auditor for Hilo Medical Center, who opined Dr. Nitta was eligible for the enhanced payments.

identified Dr. Nitta as a PCP (with an OB/GYN specialization), and that Hilo Medical Center listed Dr. Nitta as a PCP. In addition, the final decision noted that community medical professionals identified Dr. Nitta as a PCP who practices in the areas of OB/GYN and primary care. The DHS final decision ordered repayment from Dr. Nitta, however, based on his inability to meet Rule requirements for the Program.

### 2. Circuit court appeal (Civil No. 16-1-0297)

Dr. Nitta then filed an appeal with the circuit court. On April 12, 2017, the circuit court[5] issued its decision and order. The circuit court noted that, under CMS guidance, physicians had to (1) self-attest to a specialty in one of the enumerated areas or in a recognized subspecialty; and (2) be board certified in that specialty or subspecialty or meet the sixty percent billing threshold. The circuit court ruled that (1) Dr. Nitta failed to meet the self-attestation requirement of the Program because his staff member had completed the attestation; (2) Dr. Nitta did not have a specialty or subspecialty designation in one of the requisite areas; (3) because Dr. Nitta was ineligible, there was no need to address DHS's calculations regarding the sixty percent billing threshold; and (4) a review of the DHS overpayment calculations showed Dr. Nitta owed $205,338.88, not

---

[5] The Honorable Greg K. Nakamura presiding.

11

$205,220.886.  The circuit court affirmed the DHS final decision and entered its judgment on May 9, 2017.

### 3.    ICA appeal

#### a.    The appeal

On May 19, 2017, Dr. Nitta filed an appeal with the ICA. The parties basically repeated their arguments below.

#### b.    Amicus brief (HMA & AMA)

The Hawaiʻi Medical Association ("HMA") and the American Medical Association ("AMA") ("amici") filed an amicus brief. Amici highlighted the critical and worsening physician shortage in Hawaiʻi, noting that primary care has the greatest shortage, especially for Medicaid patients in East Hawaiʻi.[6]  Amici posited

---

[6]    Citing articles and other reports, the amici explained that, on neighbor islands in particular, patients often wait four to five months for a doctor's appointment.  On Hawaiʻi Island, it is sometimes two to three times more difficult to find a PCP.  Consequently, many residents seek care at the nearest hospital emergency room, costing them "upward of $600-$800 for an emergency room visit, as opposed to an average co-pay of $15-$50 for a visit to a primary care physician."

The amici attributed Hawaiʻi's physician shortage to a number of issues: (1) having one of the oldest physician workforces in the nation, meaning an exacerbated shortage as physicians retire; (2) Hawaiʻi's high cost of living in conjunction with the costs of attending medical school; and (3) the lack of funding for physicians at hospitals and in private practice.  The last issue, in particular, limits the number of physicians a hospital is able to hire and forces physicians in private practice to adopt business models that exclude Medicaid patients.  In rural areas, the effect on Medicaid patients is even greater.

Also, according to the federal Health Resources and Services Administration, East Hawaiʻi, where Dr. Nitta practices, is a "Health Professional Shortage Area."  Thus, Dr. Nitta is a physician who provides "vital services to vulnerable populations with limited access to medical care."  Amici asserted DHS's recoupment efforts against Dr. Nitta jeopardizes
(continued. . .)

that DHS's continued recoupment efforts against physicians providing primary care services to Medicaid beneficiaries only worsens the shortage.  Amici also urged that the payments to Dr. Nitta were consistent with the ACA's purpose to "benefit physicians that provide primary care services to the Medicaid population."[7]

---

(continued. . .)
his ability to continue his practice, threatening to further reduce the already limited number of PCPs in the area.

[7]    According to amici, DHS "arbitrarily determined that medical directory listings were the deciding factor of a physician's practice characteristics[.]"  Amici also argued that DHS arbitrarily and capriciously interpreted and applied the Rule by providing DHS with "unfettered discretion to determine physician eligibility."  They pointed to Questions and Answers ("Q&As") published by CMS regarding how states might review physician eligibility for the Program.  There, the CMS provided a non-exhaustive list of ways a state could verify a physician's practice characteristics (i.e., how the physician represented himself in the community, medical directory listings, billings to other insurers, advertisements, etc.).  Amici contended other evidence demonstrated Dr. Nitta's PCP status: (1) recognition by other doctors and medical providers in the East Hawaiʻi community as a PCP; (2) acceptance and payment by medical insurers as a PCP; and (3) hundreds of written and oral testimony by people in support of a finding that he is a PCP.

Amici also argued that DHS's "formula to determine the sixty-percent-threshold requirement [was] in complete disregard for actual medical practice."  To determine whether a physician met the threshold, DHS used "paid billing codes," which do not take into account the "percentage of total services provided in a managed care environment by that physician."  The CMS interpretation of the Medicaid Enhanced Payment Statute, however, stated that physicians could also self-attest that, as an alternative, sixty percent of all Medicaid services they "provide[] in a managed care environment" are PCP services.

Amici noted that, in actual practice, PCPs sometimes bill under their provider number for ancillary services (i.e., urine testing, blood work, X-rays) furnished by other professions under the physician's supervision.  In group practices, physicians sometimes also bill for ancillary services under the group provider number.  By including these ancillary services in the denominator (i.e., the total services provided by the physician) of its formula, according to amici, DHS unfairly skews the actual ratio of PCP services to total services provided by a physician.

(continued. . .)

### c.  **Averett**

While the ICA appeal was pending, the Sixth Circuit issued its <u>Averett</u> opinion invalidating the Rule that set forth additional eligibility requirements for the Program.  943 F.3d at 319.  In <u>Averett</u>, Tennessee's Medicaid agency, TennCare, had sought to recoup an average of more than $100,000.00 per physician from twenty-one physicians practicing in family medicine in rural Tennessee.  <u>Averett</u>, 943 F.3d at 316.  TennCare alleged that the physicians had not met the sixty percent billing requirement of the Rule.[8]  <u>Id.</u>  In turn, the

_____

(continued. . .)

According to amici, in Dr. Nitta's case, a medical billing and coding expert had testified that a full audit of his patient records, not just his billing records, showed that well over sixty percent of his time and work went toward providing PCP services to Medicaid beneficiaries.  Amici concluded that DHS's "use of 'paid billing codes' rather than a <u>full</u> audit of a physician's patient records in consideration of services <u>provided in a managed care environment</u> is a manipulation that produces absurd results contrary to the intent of the Medicaid Enhanced Payment Statute."  Thus, amici requested that the ICA vacate and remand the DHS and lower court's decisions.

[8]   Recall that the CMS Final Medicaid Payment Rule defined "primary specialty designation" by requiring either board certification in one of the listed specialties (or a recognized subspecialty) or the satisfaction of a sixty percent billing threshold:

> (a) States pay for services furnished by a physician as defined in § 440.50 of this chapter, or under the personal supervision of a physician who self-attests to a specialty designation of family medicine, general internal medicine or pediatric medicine or a subspecialty recognized by the American Board of Medical Specialties (ABMS), the American Board of Physician Specialties (ABPS) or the American Osteopathic Association (AOA).  Such physician then attests that he/she:

> > (1) Is Board Certified with such a specialty or subspecialty and/or

(continued. . .)

physicians challenged the requirement, arguing that it contravened the Statute.  Id.

After the district court declared the rule invalid and TennCare appealed, the Sixth Circuit addressed

> whether, in the [Rule], [CMS] correctly interpreted the phrase "primary specialty designation" as used in [the Statute], to mandate not only that the physician have the requisite designation of primary specialty, but also that the physician either be board-certified in that specialty or satisfy the 60-percent-of-billings requirement.

Averett, 943 F.3d at 317.  The Sixth Circuit opined that the term "primary specialty designation" in the Statute was unambiguous.  Id.  Neither party disputed the meanings of "primary specialty" as the physician's principal area of practice or expertise, or the meaning of the word "designate," as in "[t]o indicate or specify; point out."  Id. (citing The American Heritage Dictionary 506 (3d ed. 1992)).

The Sixth Circuit discussed CMS's interpretation of the term "primary specialty designation" under a parallel Medicare provision.  Averett, 943 F.3d at 317.  Although Congress used the same term in the same context for both the Medicare and Medicaid programs, CMS interpreted the term differently from the

_____

(continued. . .)
> (2) Has furnished evaluation and management services and vaccine administration services under codes described in paragraph (b) of this section that equal at least 60 percent of the Medicaid codes he or she has billed during the most recently completed CY or, for newly eligible physicians, the prior month.

42 C.F.R. § 447.400(a).

Medicaid and Medicare counterpart rules. Averett, 943 F.3d at 318. For Medicaid, CMS added board certification and sixty percent billing threshold requirements to the Rule. Id. For Medicare, however, CMS interpreted the term to simply mean "the physician's own designation, as her primary specialty, of one of the specialties recited in that Medicare provision." Averett, 943 F.3d at 317 (citing 42 C.F.R. § 414.80(a)(i)(A)).

The Sixth Circuit determined that the latter was the proper interpretation because, unlike the Rule,[9] it did not conflict with the language of the Statute. Averett, 943 F.3d at 318-19. It indicated this interpretation made "perfect sense, given the apparently uniform practice of physician self-designation under Medicare and Medicaid." Averett, 943 F.3d at 317. Thus, the Sixth Circuit held that the phrase "a physician with a primary specialty designation" for purposes of the Statute meant "a physician who has himself designated, as his primary specialty, one of the specialties recited in those provisions." Averett,

---

[9] The Sixth Circuit also noted that CMS did not offer any actual interpretation of the Statute in support of its construction; it offered only policy arguments. Averett, 943 F.3d at 318. CMS had argued that, because Congress did not limit the definition of "primary specialty designation," CMS was required and had authority to do so itself. Id. The Sixth Circuit disagreed, stating that the "specific limitations" were the words themselves, and that no one seemed to be confused about what they meant. Id. Additionally, Congress had included a sixty percent billing threshold in its Medicare provision but specifically left it out of its Medicaid provision. Averett, 943 F.3d at 318-19.

943 F.3d at 319.  The Sixth Circuit invalidated the Rule as inconsistent with the Statute.  Id.

### d.  Supplemental briefing

On December 23, 2021, the ICA ordered the parties to submit supplemental briefing "addressing whether and how Averett applied to the issues on appeal, and the relief sought, in light of Averett."

On January 4, 2022, Dr. Nitta filed his supplemental brief, arguing that, like the physicians in Averett, he was entitled to enhanced payments under the Program.  On January 5, 2022, DHS filed its supplemental brief, arguing that Averett invalidated the Rule only and not the Statute.  DHS argued the plain language of the Statute still required Dr. Nitta to have a primary specialty designation of "family medicine, general internal medicine, or pediatric medicine."

DHS also argued Averett also defined "primary specialty designation" and had discussed two sources that would indicate a physician's primary specialty:  the physician's Medicaid application and the National Provider Identifier ("NPI").  DHS argued that both Dr. Nitta's 1993 Medicaid application and 2006 NPI form listed his primary specialty designation as OB/GYN.

### e. ICA opinion

On February 11, 2022, the ICA published an opinion holding that (1) the Rule was invalid; and (2) the DHS self-attestation form modelled on the Rule was therefore also invalid. Nitta, 151 Hawaiʻi at 128-29, 508 P.3d at 1214-15. The ICA adopted the Sixth Circuit's analysis in Averett and held the circuit court wrongly concluded that Dr. Nitta was ineligible by relying on the Rule. Id. Based on Averett, the ICA also held that DHS's self-attestation form conflicted with the Statute because it included the Rule's additional requirements. Nitta, 151 Hawaiʻi at 129, 508 P.3d at 1215.

The ICA (1) vacated DHS's final decision and the circuit court's decision and order; and (2) remanded the case to the DHS Administrative Appeals Office "for further proceedings as may be necessary." Id.

### 4. Certiorari application

On May 23, 2022, DHS filed its application for writ of certiorari, arguing (1) Dr. Nitta was still ineligible for enhanced payments based on the Statute; (2) the circuit court's conclusions relied on the Statute; and (3) DHS is required to recoup the overpayment because there was never money appropriated to pay Dr. Nitta.

18

### III. Standards of Review

For judicial review of contested administrative cases, HRS § 91-14(g) (2012) provides:

> (g) Upon review of the record the court may affirm the decision of the agency or remand the case with instructions for further proceedings; or it may reverse or modify the decision and order if the substantial rights of the petitioners may have been prejudiced because the administrative findings, conclusions, decisions, or orders are:
>
> (1) In violation of constitutional or statutory provisions;
>
> (2) In excess of the statutory authority or jurisdiction of the agency;
>
> (3) Made upon unlawful procedure;
>
> (4) Affected by other error of law;
>
> (5) Clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record; or
>
> (6) Arbitrary, or capricious, or characterized by abuse of discretion or clearly unwarranted exercise of discretion.

### IV. Discussion

**A.  Dr. Nitta is eligible for the Program under the Statute**

**1.  DHS's position**

DHS does not contest the ICA's adoption of the Averett holding invalidating the Rule.  DHS instead argues that the ICA should have addressed Dr. Nitta's eligibility under the Statute, and that he was still ineligible.  DHS contends that Dr. Nitta was ineligible because his "primary specialty designation" was

OB/GYN, not family medicine, general internal medicine, or pediatric medicine.

We agree that Dr. Nitta's eligibility under the Statute should be addressed, and we now do so. We disagree with DHS, however, that Dr. Nitta was not eligible for the Program under the Statute. For the reasons below, he was.

## 2. A physician can have more than one specialty

At the outset, it is important to note that the term "primary specialty designation" appears in 42 U.S.C., which concerns "The Public Health and Welfare," only twice: in the Medicaid Statute at issue here, 42 U.S.C. § 1396a(a)(13)(C), and in the parallel Medicare statute discussed in Averett, 42 U.S.C. § 1395l(x).

DHS asserts Dr. Nitta's 1993 Medicaid application and 2006 NPI specialty designation control what constitutes his "primary specialty designation" for purposes of the Program. DHS posits that because Dr. Nitta had previously designated a "specialty" of OB/GYN, he was precluded from later self-designating a different "primary specialty" under the Statute.[10] Thus, DHS assumes that a physician cannot have more than one specialty.

---

[10] The NPI program replaced previous provider identifiers. See NPI Fact Sheet: For Healthcare Providers Who Are Individuals, CMS (Jan. 2006), https://www.cms.gov/Regulations-and-Guidance/Administrative-Simplification/NationalProvIdentStand/Downloads/NPIFactSheet012606.pdf

(continued. . .)

Just as the Rule at issue here could not contravene the Statute, however, NPI designations required pursuant to administrative guidance cannot violate the statutes on which they are based.

In this regard, the Sixth Circuit discussed the NPI in the following introductory passage:

> The Medicare program is funded and administered by the federal government; the Medicaid program is funded largely by the federal government but administered primarily by the states.  In 1996, Congress directed the Secretary of Health and Human Services to create a "standard unique health identifier" for each "health care provider" participating in the Medicare and Medicaid programs and to "take into account" each provider's "specialty classifications."  42 U.S.C. § 1320d-2(b).  Accordingly, at the time relevant here, the Secretary required Medicare and Medicaid providers to complete a "National Provider Identifier" form that required providers to designate their "primary specialty."  *See* Form CMS-10114 (11/08) at 1–2. Medicare providers also completed a form that required them to "designate [their] primary specialty[.]" *See* CMS-855I (02/08) at 8.  Medicaid providers likewise designated their primary specialties through "self-attestation" during most if not all states' enrollment processes.  *See* 77 Fed. Reg. 66,673–75 (Nov. 6, 2012).

Averett, 943 F.3d at 315 (emphasis added).

As indicated in Averett, NPI designations are based on administrative guidance promulgated pursuant to 42 U.S.C. § 1320d-2(b).  This statute is part of 42 U.S.C. Chapter 7 (Social Security), Subchapter XI (General Provisions, Peer Review, and Administrative Simplification), Part C (Administrative

---

(continued. . .)
[perma.cc/EWL2-EWK2] (last visited November 1, 2022).  We therefore address the effect of Dr. Nitta's 2006 NPI identifier.

Simplication); in other words, 42 U.S.C. § 1320d et. seq. is concerned with "administrative simplification."[11]

Within this Part C, 42 U.S.C. § 1320d-2 is titled "Standards for information transactions and data elements." Subsection (b) provides:

> (b) Unique health identifiers
>
> (1) In general
>
> The Secretary shall adopt standards providing for a standard unique health identifier for each individual, employer, health plan, and health care provider for use in the health care system. In carrying out the preceding sentence for each health plan and health care provider, the Secretary shall take into account multiple uses for identifiers and multiple locations and specialty classifications for health care providers.
>
> (2) Use of identifiers
>
> The standards adopted under paragraph (1) shall specify the purposes for which a unique health identifier may be used.

(Emphasis added.) Hence, 42 U.S.C. § 1320d-2 created NPIs

---

[11] The NPI system was actually established for billing and payment purposes. 42 U.S.C. § 1395u(r):

> (**r) Establishment of physician identification system**
>
> The Secretary shall establish a system which provides for a unique identifier for each physician who furnishes services for which payment may be made under this subchapter. Under such system, the Secretary may impose appropriate fees on such physicians to cover the costs of investigation and recertification activities with respect to the issuance of the identifiers.

See also National Provider Identifier Standard (NPI), CMS (Dec. 1, 2021), https://www.cms.gov/Regulations-and-Guidance/Administrative-Simplification/NationalProvIdentStand [perma.cc/DR7S-V7Q9] (last visited November 1, 2022).

for informational and data purposes.[12]  This statute requires a

"standard unique health identifier for each individual . . .

health care provider for use in the health care system."  But,

pursuant to 42 U.S.C. § 1320d-2(b)(1), the NPI system clearly

allows for "multiple . . . specialty classifications for health

care providers."

This raises the question of whether an individual physician

can be a "health care provider" with "multiple specialty

classifications."  In this regard, 42 U.S.C. § 1320d provides

definitions for all terms under Part C. 42 U.S.C. § 1320d(3)

then defines "health care provider" as follows:

> (3) Health care provider
>
> The term "health care provider" includes a provider of
> services (as defined in section 1395x(u)[13] of this title), a
> provider of medical or other health services
> (as defined in section 1395x(s) of this title), and any
> other person furnishing health care services or supplies.

(Emphasis added.)  Thus, pursuant to 42 U.S.C. § 1320d(3), a

"provider of medical or other health services (as defined in

section 1395x(s)" can be a "health care provider" with "multiple

specialty classifications" under 42 U.S.C. § 1320d-2(b)(1).  The

_____

[12]    Again, the NPI system was actually created for billing and payment
purposes.  See supra note 11.

[13]    "Provider of services" is defined by 42 U.S.C. § 1395x(u) as "a
hospital, critical access hospital, rural emergency hospital, skilled nursing
facility, comprehensive outpatient rehabilitation facility, home health
agency, hospice program"; thus, an individual physician cannot be a "provider
of services" under this definition.

additional question then is whether an individual physician can be a "provider of medical or other health care services" "as defined in section 1395x(s)."

42 U.S.C. § 1395x(s) provides as follows:

> (s) Medical and other health services
> The term "medical and other health services" means any of the following items or services:
> (1) physicians' services;
>
> . . . .
>
> (2)
> (L) certified nurse-midwife services;
> (M) qualified psychologist services;
> (N) clinical social worker services (as defined in subsection (hh)(2))[.]

(Emphasis added.) 42 U.S.C. § 1395x(s) makes clear that an individual physician (like an individual nurse-midwife, psychologist, or clinical social worker), as a provider of "medical and other health services," is a "health care provider."

Therefore, under governing federal law, individual physicians can have multiple specialty classifications under the NPI system. Thus, the fact that Dr. Nitta's initial NPI designation listed a specialty of OB/GYN did not prevent him from having another "specialty" that was his "primary specialty" during the time period at issue.

### 3. Dr. Nitta self-designated as having one of the requisite specialties as his "primary specialty"

Accordingly, Dr. Nitta was authorized to have more than one medical specialty. In order to qualify for the Program under the Statute, however, Dr. Nitta was required to have a "primary specialty designation" of "family medicine, general internal medicine, or pediatric medicine" for the relevant time period. The issue then is how that designation was to occur.

In this respect, we agree with the Sixth Circuit and the ICA that the Rule, which contained requirements inconsistent with Statute, was invalid. We also agree with the Sixth Circuit and ICA that "a physician with a primary specialty designation" for purposes of the eligibility under the Statute means "a physician who has himself designated, as his primary specialty, one of the specialties recited in those provisions[,]" which are family, general internal, or pediatric medicine.

DHS and the circuit court ruled Dr. Nitta ineligible based on invalidated Rule requirements. The parties do not actually dispute that Dr. Nitta did designate, as his primary specialty, either family medicine, general internal medicine, or pediatric medicine.

As the Rule and self-attestation form have been invalidated, the fact that Dr. Nitta did not personally submit the on-line application is immaterial. To the extent a staff

25

member had enrolled Dr. Nitta in the Program based on the recommendation of AlohaCare, Dr. Nitta ratified the action of his office staff regarding the "self-designation" and indicated that because he practices in internal medicine "all day," he was self-attesting to being a PCP who works in general internal medicine. Thus, Dr. Nitta did self-designate internal medical as his principal area of practice, or primary specialty, for the time period of the Program. This self-designation was consistent with the findings in DHS's final decision that HMSA, UnitedHealthcare, AlohaCare, and Hilo Medical Center, as well as Hilo community medical professionals in general, recognized Dr. Nitta as a PCP.

Accordingly, we hold that Dr. Nitta was eligible for enhanced payments under the Statute.

Our holding is consistent with the purposes of the Program. Congress clearly intended the enhanced payments as incentives for the provision of primary care services, regardless of a physician's other practice areas. We agree with amici that

> [t]he legislative history accompanying the [Statute] indicates that the enhanced payments were meant to address Medicaid reimbursement rates for primary care services that were substantially lower than the Medicare rates for the same services. [See H.R. Rep. No. 111-299, pt. 1, at 617-19 (2009).] Congress stated that the enhancements were necessary because:
>
>> These low Medicaid payment rates do not provide adequate incentives for physicians to participate in Medicaid, limiting access to physicians' services by Medicaid beneficiaries. In addition, low Medicaid

26

> payment rates discourage young physicians and other health professionals from entering careers in primary care, undermining efforts to address the shortage of primary care practitioners in many areas of the country.  [Id.]
>
> The legislative history further indicates that Congress intended the enhanced payments to apply broadly to "primary care services furnished by <u>any participating physician or health professional, not just a primary care physician or professional</u>[.]"  [Id. at 618 (emphasis added).]

For all of these reasons, Dr. Nitta was eligible for enhanced payments pursuant to the Statute.

## B.   DHS's other points on certiorari lack merit

### 1.   The circuit court relied solely on the invalid Rule when it deemed Dr. Nitta ineligible for the Program

DHS also asserts on certiorari that the circuit court did not solely rely on the Rule, but also relied on the Statute when it deemed Dr. Nitta ineligible for the Program.

Our holding above resolves this issue.  If the circuit court had determined Dr. Nitta ineligible based on the Statute, it would have been wrong.  But the record reflects the circuit court (and DHS) relied solely on the invalidated Rule in deeming Dr. Nitta ineligible and not did not rely on the Statute.

### 2.   DHS waived its appropriation argument

Finally, we reject DHS's third issue on certiorari, that DHS is required to recoup the overpayment because there was never money appropriated to pay Dr. Nitta.  This is a new argument never raised below and is therefore waived.  <u>See</u> <u>Ass'n of Apt. Owners of Wailea Elua v. Wailea Resort Co.</u>, 100 Hawaiʻi

27

97, 107, 58 P.3d 608, 618 (2002) ("Legal issues not raised in the trial court are ordinarily deemed waived on appeal.")

### V. Conclusion

Having determined Dr. Nitta eligible for enhanced payments under the Statute, we vacate the ICA's March 23, 2022 judgment on appeal to the extent it remanded the case "to the DHS Administrative Appeals Office for further proceedings as may be necessary."  The ICA's judgment on appeal is otherwise affirmed.

Erin N. Lau
for petitioner

Eric A. Seitz
for respondent
Frederick Nitta, M.D.

/s/ Mark E. Recktenwald

/s/ Sabrina S. McKenna

/s/ Michael D. Wilson

/s/ Todd W. Eddins

/s/ Shirley M. Kawamura

